**United States District Court For
The Southern District of New York**

_____X

**HERBERT FEINBERG,**                                    **15 CV 5198(RA)**

           **Plaintiff,**                          **COMPLAINT FOR
                                                        INJUNCTIVE AND**
     **v.**                                        **OTHER EQUITABLE
                                                        RELIEF**_____

**APPLE, INC.**

              _Defendants._

_____X

    Plaintiff by his Norman B. Arnoff, Esq. assert the following allegations both on their knowledge and upon good faith and information and belief.

1.    Plaintiff Herbert Feinberg, is a homeowner and resident of 17  East 74th Street and Madison Avenue, New York City, New York 10021.

2.    Plaintiff is a member and leader of a group of neighbors calling themselves the group "Saving the 74th Street Residential Neighborhood" that is composed, thus far, of over 400 residents of the East Side neighborhood between Park and Fifth Avenues, from 72nd to 76th Streets ("the neighborhood") all of whom are united in their opposition to the opening of an Apple retail store if it operates in a manner incompatible with the individual and community interests of this upper east side and historic residential neighborhood.

3.    Defendant Apple, Inc. ("Apple") is an American multinational corporation, headquartered in Cupertino, California, and has a least four (4) offices for doing business in New York County, including an office located at 767 Fifth Avenue, New York, New York..

4.    Defendants designs, develops and sells consumer electronics products, including software

1

and online services. Its products include the MAC line of computers, phones, watches, laptops, tablets, TVs, and many other products. Operating globally, Apple has the largest market capitalization of any publicly traded corporation in history.

I.

## Jurisdiction Venue and Standing

5.    This Court has jurisdiction and venue of this action pursuant to 28 USC Section 1332. The parties have offices and/or home residences, in the neighborhood described above and are available for service of process in New York State and New York County.

6.    Plaintiff has standing to bring this action to maintain the values of his home and the quality of life as a homeowner and resident of the Neighborhood. Plaintiff's home is a brownstone located at 17 East 74th Street, New York City, New York 10021 that is located eighty-seven and one half (87 1/2 ) feet from where the Apple store is now located and should not be subject to the unique hazards that are presented by the Apple store if its usual and customary operations in other locations will take place in Plaintiff's neighborhood.. Plaintiff brings this action for injunctive and other appropriate equitable relief because Defendant Apple Store by establishing a retail store in the neighborhood and operating it as it does other of its retail stores, will interfere with his right of quiet enjoyment as well as the right of quiet enjoyment of other homeowners and residents whose signatures are affixed to the petition of the "Saving the 74th Street Residential Neighborhood" group annexed in the Appendix to this Complaint and the Supporting Affidavit submitted in the action in the Supreme Court, of New York, New York County Index No. 651937/2015 that was removed to this Court pursuant to 28 U.S.C. Sections 1332 and 1446 by Defendant-Apple.

7.    The common law of nuisance distinguishes between public and private nuisances. An action to abate a private nuisance may be brought by one or more private citizens who can show *special* injury to themselves and damage the property they own. A public nuisance action is generally

2

considered to be one affecting the members of the public in common, and under normal circumstances can be brought only by a "governmental authority" on behalf of the public affected by the nuisance. In the instant case, Plaintiff and his neighbors contacted government agencies to no avail as well as attempted in good faith to negotiate with Apple, also to no avail. Accordingly, Plaintiff also brings this action for injunctive relief individually for the special injury he will sustain as well as for others in the Neighborhood so his and the basic rights of others to maintain the value of their homes and the right of quiet enjoyment are not violated.

8.    Plaintiff has standing (i.e. "every man's home is his castle") because of the close proximity of his home at 17 East 74ths Street, New York City, New York 10021 to the historic bank building Apple now occupies and the special injury that he will sustain should the circumstances and violations described in this Complaint result in material injury to himself and property damage to his home.

9.    The foregoing distinction of private and public nuisance is premised upon the common law.

10.    Based upon the operations and activities of other Apple Stores in other neighborhoods, Plaintiff has every reason to believe that Apple's operations and activities in the Upper Eastside Seventy-Fourth Street and Madison Avenue location will constitute a private nuisance to himself and a public nuisance to the neighborhood residents and homeowners such as himself.

11.    Plaintiff has contacted governmental authorities, including the New York State Attorney General's Office and the New York City Department of Law that would not take action at this time, leaving to Plaintiff the responsibility as an interested and responsible citizen to prevent the wrong to himself and the neighborhood community.

12.    Representatives of each of the authorities stated that their agency could not or would not

3

take any action at this time. Plaintiffs has sent letters to the authorities confirming that each has no intention of bringing such as action. Copies of the letters and opposition petition are set forth in the Exhibits to the Supporting Affidavit of Plaintiff filed with the Complaint in the Supreme Court of New York, New York County that is now a part of the Record in this action.

13. Plaintiff has attempted to negotiate in good faith with Defendant that has refused to agree to any reasonable conditions or restrictions to reasonably assure the health and safety of the Neighborhood or in respect to Plaintiff's and the other neighbors' right of quiet enjoyment in respect to their property. Apple continued to have or has created new landmark violations, inter alia; visible protrusions on the roof consisting of air conditioners and steel bars on the windows that were covered with vinyl signs; obviously to conceal the landmark violations that have now been removed as a result of the New York City Landmark Commission's June 2, 2015, Stop All Work And Warning Letter, also included in the Exhibits file with the Complaint and his Supporting Affidavit in the action in Supreme Court ,New York County..

II.

## Background Facts Pertinent to Other Apple Stores as a Basis For This Complaint and The Injunctive and Equitable Relief Sought

14. Apple had only recently acknowledged that it had leased the property, and the historic landmark building, was renovating at 940 Madison Avenue. A photo of the façade of the building as it exists today is incorporated in the Appendix and demonstrated it had violated landmark restrictions that were the conditions by which building permits were issued. Apple opened the store in the landmark bank building June 13, 2015.

15. In March 2015 Apple bought out the tenant of a store in 23 East 74th Street, the building adjoining the proposed Apple retail store, and required the tenant to move immediately. Apple also

4

tried to buy out the lease of an adjoining restaurant, in the same building at 23 East 74th Street and the lease of another store on Madison Avenue adjoining its corner building clearly evidencing its intent to have sufficient space to conduct a full scale commercial operation comparable to other locations that also creates the inference that the interior of the building does not allow for easy or safe egress in case of fire or other emergency.

16.    Madison Avenue is one of the great New York City Streets, and to help preserve it the community organized "Saving the 74[th] Street Residential Neighborhood", and has mailed and distributed a petition throughout the neighborhood, in which residents have strongly expressed their opposition to the opening of another Apple store *if it operates in the manner of its other retail stores*, and to the congestion and commercialization of the neighborhood that the store will bring once it is established and operational unless appropriate conditions and restrictions are in place that will be suitable to the Neighborhood. Over four hundred (400) petition signatures have thus far been received, copies of which are in Exhibits to his Supporting Affidavit..

17.    The Apple Store opened June 13, 2015.

16.    Plaintiffs alleges that each of the instances of nuisance conditions set forth in this ... complaint have already occurred at some or all of the existing Apple stores in Manhattan. This establishes the probability that these same conditions and circumstances will take place if the store operates on Madison Avenue and 74th Street in the same or similar manner to other locations unless this Court intervenes and orders appropriate relief.

17.    Plaintiff alleges the total impact of the store's operations will be far greater at Madison Avenue and 74th Street than at any of the existing Apple stores, first, because none of the other stores are located as closely to so many residential buildings, and second, none are located on narrow streets that already have or will exceed their capacity based upon Apple's anticipated business. Further none

5

of the other Apple stores are located in a similar residential neighborhood but are located in distinct commercial areas.

18.    The existence of a nuisance both, private and public, requires a case by case determination, and it is almost totally dependent upon the individual facts, and therefore, it is necessary to set forth for this Court the factual details which constitute the activities and conditions that make an Apple store, a private and public nuisance in the East 74th Street neighborhood based upon the way Apple operates in other locations.

19.    There will be a massive increase in pedestrian traffic. Madison Avenue in the 72nd to 76st Street blocks, is today already a scene of heavy pedestrian traffic. It is predominately a residential neighborhood, with many property and apartment owners and tenants as well existing retail operations that are essentially boutiques. There are four major apartment buildings on, or just off, the corner of Madison Avenue and 74th Street, all less than 100 feet from the proposed store. There also are also four (4) huge apartment buildings on 74th Street on the Madison and Fifth Avenue corners.

20.    Madison Avenue already has a number of small and luxury retailers that have been drawn to leasing the existing stores. There are well-known art galleries that draw visitors consistent— with the neighborhood culture and capacity.

21.    Directly across from the proposed store, on Madison Avenue, a developer is erecting a building with ten (10) condominium apartments and renovating six (6) existing retail stores. The condo units will bring more residents and the new retail stores will attract more new customers and visitors to Madison Avenue that will already be strained in its capacity which should not be subject to the risk of total overload.

22.    On the 75th Street Corner, the Metropolitan Museum has leased the legendary Breuer building, former home of the Whitney Museum, and is presently renovating it as a showcase for the

6

Met's contemporary and modern art collection. The Whitney attracts about 350,000 visitors a year, with lines sometimes stretching around the block. The N.Y. Times has estimated that the annual number of visitors to the "New Met", only a seven (7) block walk from the "Old Met", conservatively will at least double to over 700,000 a year. There could easily be another 1,000,000 museum visitors a year on Madison Avenue between 74th and 75th Street.

23.    When the visitors to the Met are added to the traffic at both the existing and the new retail stores, in addition to the large number of residents who use the sidewalks and the streets daily, the entire area, as the Times also said, will be "*mobbed*."

24.    The very existence of an Apple store creates and multiplies crowds unless remedial measures are taken to render Apple's operations compatible with the neighborhood.  On any given day, in other locations crowds of customers can be found on the surrounding sidewalks, seeking entry to the store.  Photos of the inordinate customer crowds are included within the Exhibits to the Supporting Affidavit.

25.    Plaintiff alleges that as a consequence of the foregoing and the other facts set forth in this Complaint , Apple's conduct of its retail sales business will be a serious public nuisance as well as a private nuisance, especially with respect to the fire hazards  unless appropriate conditions are imposed for the business will  be conducted in a predominantly  residential, non-commercial, neighborhood, and in such a manner that  unreasonably and materially will interfere with the general well-being of the residents and violate their basic right of quiet enjoyment.

26.    Defendant Apple stores has not agreed to any undertakings, conditions, or restrictions consistent with public welfare and interest even though approached by Plaintiff  and the Neighborhood Association thus causing Plaintiff to bring this action for injunctive and other equitable relief on behalf of himself individually as well as  his neighbors.

7

27.    The frequent presence of unregulated crowds of customers is a forseeable nuisance that will interfere with the right of the residents to their unobstructed use in non-emergency conditions of the sidewalks and the streets of their neighborhood. This will not only threaten the use of the sidewalks but at times totally preclude their use .Plaintiff makes these allegations based on the analysis of Apple Stores at other locations and their operations.

28.    The company's marketing policies call for the periodic release of its products -- the "launch date" or the "release date" -- with a major advance publicity build-up to create consumer anticipation that leads to crowds that will cause unreasonable conditions in the neighborhood both obstructing passageway and negatively affecting the homeowner's right of quiet enforcement

29.    Apple's  systematic policy provides for a release of new products at staggered intervals. In September 2014 Apple  brought the launch of their new smartphones; then came the new MacBook; next there was the anticipated introduction of a newer Apple TV in late 2015; currently "The Watch," and the "iPhone 7" is projected for 2016. All of the foregoing were and will be carefully calculated and timed to generate maximum consumer interest and traffic – and revenue which in consequence, if not regulated will cause both private and public nuisances. The consequences are both foreseeable and inevitable as the East 74th Street neighborhood has now been targeted by Apple to be commercialized so it can operate in similar fashion to other locations.

30.    On "release" dates, large crowds of buyers inundate a neighborhood.  Coverage takes place by local network and cable TV in respect to other locations that have shown lines of eager and significant numbers  of customers, winding, for example, around the Fifth Avenue store down 59th Street to Madison Avenue, up Madison to 60th Street, and back to the Fifth Avenue store *i.e.,* around the block.  This pattern is repeated at all the Manhattan stores at each "launch date."  Photos of the lines of waiting customers are incorporated in the Appendix.  TV sound trucks and camera crews

8

6

continue to record this mayhem, and with the new store this will become another regular feature of the Madison Avenue location.

31. Apple stores has itself recognized and encourages the spectacular crowds, acknowledging that even its "in-store demonstrations" are likely to "create crowded, frenzied scenes" (www.ifoapplestore.com). At a recent launch in another location, Apple's announcement stated "We're assuring the lines will be long in the early day." (www.macworld.com)

32. The occupation of the neighborhood, its sidewalks, and its streets, by long lines of Apple customers, lined up behind police barricades, waiting for hours, or days, to get into the Apple store, is conduct that will interfere with, and cause damage both to the public in the exercise of the common right of all citizens to leave their homes regularly and consistently without obstruction of the sidewalks as well as the residents and homeowners in proximity.

33. As release dates approach, customers begin lining up days and weeks in advance of the first sale date. This means there will be camping out on the sidewalks, with sleeping bags, blankets, parkas, chairs, perhaps a table, and eating facilities for many days. Photos of the scenes of street side campers are incorporated in the Exhibits to the Supporting Affidavit. Apple has refused to commit to any action that will prevent or alleviate the conditions described.

34. The sidewalks of East 74th Street at both Madison and Fifth Avenues, and the adjoining streets, will literally become a customer's "home" for a week or two, or more. Apple encourages this extended activity through its media advertising, and makes arrangements for bathroom and wash-up facilities in surrounding buildings for its sidewalk campers thus evidencing its knowledge of the inevitable consequences to the nature of its usual and customary operations.

35. The long lines of customers waiting to enter an Apple store, to buy existing merchandise or a newly "launched" products, aggravated by "camping out" on the sidewalks, for days or weeks,

will require the Police Department to bring in truckloads of barricades to set up along the sidewalks and the curbs to keep the crowds under control. At a "major-crowd" time, many additional police officers are required, on a regular basis, and there will be a "police presence" on Madison Avenue so that Apple can conduct its retail store. See the photos included within the Appendix.

36. The take-over of the sidewalks on Madison Avenue and 74th Street by persons camping out for days, waiting for their goods to go on sale, is a nuisance condition that is in no way compatible with the character of the historic East 74th Street Residential Neighborhood residential community.

37. Based on a review of what has occurred and is occurring at other Apple store sites, numerous street vendors will add to the conditions of obstruction and disturbance of the neighborhood and the residents' right of quiet enjoyment.

38. Mobile food trucks will also park at the Madison Avenue corner, and wherever they park their trucks, there is no remaining space at either curb to park for deliveries or otherwise. Included in the Appendix are photos of the daily food truck activity in front of the Apple store on Broadway and 68th Street. Such activity and its consequences will dramatically impact the neighborhood and its property values.

39. Licensed by the City, the food trucks have developed a thriving business selling Apple customers. A "food truck fight" controversy arose at the 68th Street store when opponents took to the streets and claimed, at the Community Board and elsewhere, that the mobile eateries were taking over, threatening the environment, creating a nuisance, destroying the quality of life, and harming local businesses. Food trucks have no place in the narrow, congested residential space at Madison Avenue and 74th Street, but if the store opens unless restricted, they will follow Apple from the West Side to the East Side to set up shop.

40. There have been other instances in respect to other stores i.e. twelve (12) hot dog and

10

food stands in front of one Apple store. The clutter of that amount of equipment, together with the

back-up support vehicles, all mixed into pedestrian traffic including the hot dog customers, on an

exceedingly narrow a sidewalk only fifteen (15) feet wide, as are the sidewalks the East 74th Street

residential neighborhood; is the very definition of a public nuisance and a private nuisance for

individual home owners and residents. Residents passing by will be pushed, jostled, and put at a

safety risk, especially the elderly.

    41.    The customary store hours of operation at other Apple locations are incompatible with

the neighborhood. Apple stores are all open seven (7) days a week, none close before 9:00 p.m. or

10:00 p.m., Monday through Saturday, and all street-level stores are open on Sundays until 8:00 p.m.

The existing Fifth Avenue store is open twenty four (24) hours a day, seven (7) days a week, three

hundred sixty five (365) days a year..

    42.    Apple's fixed store opening and closing times as evidenced at other locations means that

a store at Madison Avenue and 74th will also be open until 9:00 p.m. or 10:00 p.m. every night of the

week, including Saturdays, and 8:00 p.m. on Sundays and this is incompatible with a residential

neighborhood if crowds are attracted.. The potential for Apple's customers descending on the 74th

Street neighborhood on Saturdays and Sundays, all day and all evening, will be an intrusion and

nuisance in a residential community whose streets, walkways, and other conditions do not have the

capacity to take such numbers. This will not be consistent with public health and safety for either the

residents or the crowds that will form as a result of the way Apple does business ;if their business is

conducted in a manner similar to other locations.

    43.    Injecting into a quiet neighborhood unwanted crowds and traffic, resulting from Apple's

having its doors open for twelve (12) hours a day, seven (7) days a week, solely for its own economic

reasons, is not only to treat the neighborhood with no respect leaving no respite from busy commercial

11

activity, but it is to create a constant invasion of the rights of quiet enjoyment of the East 74th Street Residential Neighborhood.

44. Other Apple stores have had noisy Rock N Roll concerts. Certain Apple stores are constructed with a large built-in stage at the back of the store, with rows of permanent seats, not only for discussion groups, meetings and lectures, but for musical concerts, i.e. annexed as Exhibits in the Supporting Affidavit are photos of the store on Prince Street in SoHo, showing the concert area, technicians, sound equipment and speakers, and musical instruments in place. The sign above the stage reads: "We're Getting Ready for Showtime".

45. Plaintiff has been informed that people living in the SoHo community have experienced unexpected and unwanted musical performances, and have required police intervention to curtail the noise. Noise from a rock concert spreading into the surrounding streets is but one manifestation of the increase in the general noise level that will result from the commotion, the heavy pedestrian traffic, vehicles picking up and delivering and ungovernable crowds calling for the need of more frequent police protection that will be brought to an incompatible neighborhood.

46. The sidewalks at each of the other street-level Apple stores are all wider, longer, and have a larger total area adjoin the two exposed sides of the store than does the proposed East Side store. The total sidewalk square footage, for each of the Apple stores is set forth in the annexed Supporting Affidavit of Plaintiff.

47. The measurements establish that the average available sidewalk area at the existing stores (excluding the vast block-long plaza at the Fifth Avenue store) is 3,084 sq. ft., but the available sidewalk area at the proposed Madison Avenue store is only 1,356 sq. ft. This is less than half of the average sidewalk area around the other Manhattan sites where Apple located one of its stores.

48. The consequence is that the available sidewalk area at the Madison Avenue location will

12

result in hordes of customers lined up on sidewalks that are dramatically narrower and smaller than at any of the other store locations. For the customer traffic, that will line up "around the block", the sidewalks on the adjoining street are equally narrow and will be equally congested.

49.    Currently the store space is too small and the surrounding sidewalks are too small. In consequence as shown, the street is too small for truck deliveries. Plaintiff attempted to communicate with Apple as to how the conditions described will be addressed without any constructive response.

50.    There are narrower street spaces on Madison Avenue that now is a heavily travelled street that is distinctly narrower than Manhattan's other north-south arteries. It is only eighty (80) feet wide, curb to curb, and with parking permitted on both sides, the available space for vehicular traffic is only approximately (sixty) 60 feet. Trucks delivering and picking up merchandise at the proposed store must double park on Madison Avenue while loading and unloading, will create more street congestion than already exists.

51.    The congestion on East 74th Street will be far greater than at other Apple locations, for the street is barely sixty (60) feet wide, with twenty four (24) hour on-street parking, and space for only one (1) lane of moving vehicles. This obviously heightens the risk of greater congestion, in a defined neighborhood that cannot take the magnitude of the crowds anticipated.

52.    There are wider streets surround Apple's other stores. Included within the Exhibits to Plaintiff's Supporting Affidavit as Exhibits that was filed in the Supreme Court of New York, New York County are photos showing the store on Broadway at 68th Street with a wide expanse of roadway, and the store located at 9th Avenue and 14 Street, with wide streets on both exposed sides of the store. There is expansive block-long street space at the Fifth Avenue store location. There is no vehicular congestion at these store locations and trucks have ample space to park and deliver, in stark contrast to what will be available at the 74th Street Madison Avenue store. Apple has made no attempt

13

to address these problems at this time or at least communicate to the neighborhood it is doing so, in part making this action necessary.

### III.

### Facts Pertinent To Raise A Serious Issue For The Public Interest In That Apple Presents A Serious Fire Hazard In the Lack Of Independent And Remote Exits For Safe Egress For Occupants of the Building In Case of Fire or Other Emergency And Other Discernible Conditions And Violations Of Building Codes And Fire Safety Standards

53.    Prior to the commencement by Plaintiff in the Supreme Court, New York County, a walk by and through the Store was performed as described below raising a serious question of fire safety which Apple refuses to address, other than stating it has all necessary building permits and authorizations.

54.    In reference to the 940 Madison Avenue Store on East 74 Street there is concern as to the egress arrangements from the lower level of the Store in the event of fire.  What is stated below are pertinent facts observed after a walk by and through the Madison Avenue store.

55.    At peak selling times, an Apple retail store may easily have 200 or more customers in the store, along with at least 50 sales personnel.  It is not unusual, when a new product is marketed, to have long lines of customers standing on the sidewalks, sometime around an entire block, waiting to enter the store.  The heavily congested scene at the other Apple Stores has been shown frequently in the press and on TV.

56.    The retail store operates on main level and basement level.  There is a small elevator operating between the two (2) levels.  At the rear of each level there is a means of egress from the selling areas, each through two exit access doors into enclosed rooms or corridors, out an exterior door from the building to an enclosed narrow fifty (50) foot long alley way, which leads to (two) (2) or

14

more exit doors, and then out to the public street, the "exit discharge area" which is Madison Avenue. This means a customer must go through at least five (5) exit access doors to get out of the building.

57.    More particularly, on the main level of the store, the only means of egress (aside from the main entrance to and from the (street) is through an exit access door at the back of the store. This leads into the store's "Inventory Room", which naturally contains thousands of dollars of merchandise (i.e. Apple's $17,000 smart watches). There is an "exit sign over the doorway.

58.    The door to this room is closed at all times and is said to be kept unlocked so that employees can enter or leave the room, as needed. This may be problematic, given the valuable contents. To leave the building, a person must then go through the long and narrow inventory room, and at the far end is another access exit doorway (also marked "exit" above it), to a third door leading to an alleyway or corridor outside of the building.

59.    At the back of the lower level of the store is, first one closed exit access door and then, immediately, a second closed exit access door, both said to remain unlocked (also with an "exit" sign over the doorway). This leads into another long corridor, at the end of which is a flight of stairs up to the level of the main floor, and out a second access door into the alleyway. This door is next to the door leading out of the main level of the store, as described above.

60.    This alleyway existed before Apple took over the building and no demolition or renovation work was done to it. Apple merely used what it found, and did not attempt to improve upon it. The architect's drawings show the alleyway was as fifty (50) feet long, from the point of the two (2) exit doors described above to the public street.

61.    On one side of this alley or corridor is the wall of the Apple store, two (2) stories high. On the other side of the corridor is the wall of the next building, perhaps seven (7) feet high, with a fence on the top, and a roll of razor wire on the top of the fence. The result, quite obviously, is that

15

there is no way out of this 50 foot corridor except at the far end and leading to the public street.

62.     The plans do not provide a measurement of width of this corridor (again Apple did not work on it) but the photos that have been taken show a corridor with barely more than three (3) feet. This is a passageway that is potentially a serious problem in the event that significant numbers of people need to evacuate through this alleyway.

63.     At the end of this alleyway leading to the street, there is more serious trouble. There is, first, a locked exit access door, with a standard release handle on the inside which, when depressed, unlocks and opens the door. This leads to a "vestibule" which on one side has a doorway leading to Davis Webb Jewelers, an international jewelry design company. David Webb, a jeweler, has a small entranceway area and then stairway leading to the entire second floor over the Apple store. The vestibule is approximately three (3) feet wide by (6) feet long. At the public street side of this vestibule are two (2) huge steel doors, which are locked at all times. The David Webb store is closed evenings and weekends.

64.     An electrical "door" "opening" mechanism has been installed, in the vestibule, directly above the first door into the vestibule. When the release arm on that door is depressed, not only will the door open, but a wire runs from the mechanism above that door, around the vestibule, and connects with two or more electrical boxes above the steel exterior doors. Opening the first door into the vestibule is said to also unlock the exterior steel doors, the second set of doors, thereby permitting people to get to the public street. The opening to the street between the two large steel doors is reduced, by its large door frame, to less than three (3) feet in width. Thus the means of egress from neither floor of the store involves going through two closed (and hopefully unlocked) interior doors, following narrow corridors, using a stairway from the lower level, going through an exterior door to get out to a narrow alleyway, 50 feet long, and then through two more exit access doors to get to the

16

public street.

65.    In the event there is a malfunction in any way in the "unlocking mechanism" of the last
two (2) "vestibule doors", there is not apparent escape. This presents a highly dangerous condition
and in the event of fire it risks the loss of life and in reasonably possible and meaningful numbers. A
total of **five doors**, two to get through interior rooms or corridors, stairway and then through the
exterior doors to get the outside alleyway, and then through the exterior doors to get to the outside
alleyway, and then through two or more doors to the public street is a large and unacceptable burden
and level of difficulty.

66.    Further research has shown the new fire alarm system was disapproved (for the fifth
time) in June 2015 and the store will have to have a fire watch during all times and if they do not they
are or will be in violation. There is no evidence that Defendant has complied with the fire alarm
system requirements.

67.    The foregoing was brought to the attention of Apple and its counsel to precipitate further
inquiry, due diligence, and response, however none was forth coming. As a result Plaintiff has no
other choice but to proceed with instant action to eliminate or mitigate the serious fire safety risk that
not merely prejudices his and other neighbors' interest but the public interest as well.

## AS AND FOR A FIRST CLAIM FOR RELIEF: PRIVATE NUISANCE

68.    Plaintiff alleges paragraph 1 to 67 as if fully set forth herein.

69.    Plaintiff has attached to this Complaint an Appendix consisting of Plaintiff's supporting
affidavit and documentary exhibits that were filed with the Complaint in New York State Supreme
Court, New York County, demonstrating that Plaintiff and his neighbors have taken all the steps
possible to prevent the anticipated problems; enter into good faith negotiations with Defendant;

17

contact public authorities; and all other reasonably possible steps to prevent or mitigate the reasonably foreseeable consequences of Apple establishing a retail store at 980 Madison Avenue and East 74th Street that will adversely affect Plaintiff's property value and his right of quiet enjoyment.

70.    Plaintiff brings this action for injunctive and other equitable to abate prevent on an ongoing basis a private nuisance that will violate his individual rights by reason of his home's location and close proximity to the Apple Store at 940 Madison Avenue. Such nuance will do irreparable damage to both the value of plaintiffs' home and his right to quite enjoyment unless remedial action is taken or ordered by this Court.

## AS AND FOR A SECOND CLAIM FOR RELIEF: PUBLIC NUISANCE

71.    Plaintiff alleges paragraph 1 to 70 as if fully set forth herein.

72.    The facts and circumstances of Apple stores establishing a retail store at the East 74th Street and 940 Madison Avenue location in a what was formerly a bank building with landmark status, will constitute a public nuisance that will adversely affect all homeowners, residences, and businesses that exist and operate in the neighborhood unless it is done in a manner that is lawful and consistent with the East 74th Street residential neighborhood's appearance and realities, especially because Defendant's Store is apparently a fire hazard as a result of the lack of independent and remote exits to allow for safe egress in case of a fire or other emergencies.

73.    The Apple Store located at 940 Madison Avenue if it operates in a manner consistent with other of its New York City locations will do injury to all those living in and working in the neighborhood, both generally and as well as specifically in respect to their individual property rights and warrants this Court now granting injunctive and other equitable relief, especially and notwithstanding that due notice of the neighborhood's concerns were provided to Apple and governmental agencies; who to this point in time have not responded nor intervened.

74.    Further Plaintiff brings this action for injunctive and other equitable to abate the immediate threat of an ongoing private as well as public nuisance in a historic and upper east side neighborhood that will adversely affect the economic value of his property and his right of quiet enjoyment as well as the rights of others similarly situated.

75.    The absence of governmental intervention and the unwillingness of the Apple Store's management to engage in good faith discussions to prevent both a private and public nuisance mandates that the Court allow Plaintiff as a private citizen to seek injunctive and other appropriate equitable relief on behalf of himself for his own special economic injuries as well as the rights of every individual that resides at, lives in, owns property in, and passes through the neighborhood by the bringing of such action.

WHEREFORE, Plaintiff respectfully asks that this Court issue injunctive and such other equitable relief including ordering a prompt evidentiary hearing that will protect the homeowners and residents of the neighborhood so that the contemplated Apple Store will not adversely affect property values and the rights of quiet enjoyment of the homeowners and residents, and such other and further relief as to this Court may seem just and appropriate.          --

Respectfully submitted,

Norman B. Amoff, Esq.
Law Offices of Norman B. Amoff
60 East 42nd Street
Suite 628
New York, New York 10165
(917) 912-1165
*Attorney for Plaintiff-Herbert Feinberg*

19

Case 1:15-cv-05198-RA   Document 23   Filed 11/30/15   Page 20 of 20

To:    Adam Offenhartz Esq
        Gabrielle Levin Esq.
        *Attorneys For Defendant Apple Inc.*
        Gibson, Dunn ,& Grutcher LLP.
        200 Park Avenue, New York,
        New York 10166-0193
        (212-351-4000)